IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 4, 2024

IN RE **RYAN B.**

**Appeal from the Juvenile Court for Franklin County**
**No. 2023-JV-6     David L. Stewart, Judge**
_____

**No. M2023-01653-COA-R3-PT**
_____

The Juvenile Court for Franklin County ("the Juvenile Court") terminated the parental rights of Chasity R. ("Mother") to her son, Ryan B. ("the Child"). Mother has appealed, challenging only the Juvenile Court's finding that termination of her parental rights was in the Child's best interest. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

Michael D. Hall, Winchester, Tennessee, for the appellant, Chasity R.

Jonathan Skrmetti, Attorney General and Reporter, and Katherine P. Adams, Assistant Attorney General for the appellee, Tennessee Department of Children's Services.

**OPINION**

**Background**

In September 2012, the Tennessee Department of Children's Services ("DCS") filed a petition for emergency temporary legal custody of the Child and his siblings in the Juvenile Court. DCS alleged that the Child was dependent and neglected and that Mother had been arrested for theft over $500 and two counts of contributing to the delinquency of a minor. After Mother's arrest, DCS placed the Child and his siblings with Kenneth and Sherry D., pursuant to an immediate protective agreement. When Mother was released from jail, she visited the Child and his siblings at Kenneth's and Sherry's home, snuck them out the back door, and left with them.

Mother was then charged with a different instance of theft over $1,000; two counts of child abuse/neglect; two counts of reckless endangerment; and two counts of contributing to the delinquency of a minor. Mother also was served with two truancy subpoenas with respect to two of her children. Additionally, DCS expressed its concern with Mother's "mental instability." The Juvenile Court entered a protective custody order placing the Child and his siblings in Kenneth's and Sherry's custody.

In February 2013, the Juvenile Court entered an order adjudicating the Child dependent and neglected by Mother. Mother waived the adjudicatory hearing and admitted to the allegations in DCS's dependency and neglect petition. The Juvenile Court granted custody of the Child to his father, Lee B. ("Father").

In September 2013, Mother filed a *pro se* petition seeking custody of the Child and his siblings. The Juvenile Court denied her petition, found that Mother suffered from mental health issues, and ordered her to complete mental health and parenting assessments. The Juvenile Court granted her supervised visitation with the Child on the first, second, and fourth weekends and phone calls on Tuesdays and Thursdays.

Mother appealed the Juvenile Court's denial of her petition to the Circuit Court for Franklin County ("the Circuit Court"). The Circuit Court dismissed her appeal but provided for an expanded visitation schedule if Mother obtained a residence. The Circuit Court further provided: "[M]other's visitation will continue to be as set-forth in the attached Permanent Parenting Plan upon the mother obtaining her own residence, however the mother will have one hundred eighty (180) days in which to complete the parenting assessment and mental health assessment . . . or her expanded visitation will be subjected to be suspended by the Court."

In May 2016, DCS filed a petition for emergency temporary legal custody, alleging that the Child was dependent and neglected by Father and requesting that the Child be placed in the temporary legal custody of Lee B., Sr. and Carolyn B. ("Paternal Grandparents"). DCS's concerns were based upon Father's alcohol abuse and domestic violence. The Juvenile Court granted DCS's petition and awarded Paternal Grandparents custody of the Child. The Juvenile Court held a hearing and entered an order in July 2016, in which it reiterated that Mother continued to have supervised visitation with the Child, that she needed to complete a psychological evaluation, and that she needed to establish stable housing. Mother was present at the hearing.

In March 2020, DCS filed a petition to adjudicate the Child dependent and neglected by Father. DCS alleged the following:

> DCS received a referral on or about January 15, 2020 alleging that:
> [the Child] was originally taken away from dad . . . and put in his

grandmother[']s . . . custody. Recently, dad and grandmother went to court and dad was granted custody, but grandmother still has rights. The courts made this decision because Grandmother is over 70 and unable to handle [the Child's] aggressive behaviors alone. [The Child] has Down Syndrome and severe, behavior issues.

DCS detailed the many instances in which Father's alcoholism had affected his ability to parent and care for the Child. The Juvenile Court accordingly entered a protective custody order placing the Child in DCS's custody. In July 2020, the Juvenile Court entered an order adjudicating the Child dependent and neglected by Father.

On January 20, 2023, DCS filed a petition to terminate Father's and Mother's parental rights, alleging the following grounds: (1) abandonment by failure to visit, (2) abandonment by failure to provide a suitable home, (3) substantial noncompliance with permanency plan, (4) persistence of conditions, and (5) failure to manifest an ability and willingness to assume custody. DCS further alleged that termination of parental rights was in the Child's best interest. Mother filed a notice, contesting DCS's petition and requesting an attorney be appointed for her.[1]

At a hearing in April 2023, Mother presented an oral motion for visitation. As reflected in a May 2023 order, the Juvenile Court denied her motion, finding: "due to the history of the case, the mother's lack of appearances before the Court, the mother's lack of involvement in this case, and due to the termination of parental rights hearing less than a month away it is not in the best interest of the child to allow mother visitation with the child at the present time."

Trial on the termination petition was conducted in September 2023, and the Juvenile Court heard testimony from Mother, Father, and two DCS family service workers—Eric Henson ("Henson") and Camillia Hadley ("Hadley").[2] At the time of trial, the Child was almost sixteen years old and had been living in a Department of Intellectual and Developmental Disabilities ("DIDD") home called Compassionate Care since November 2022.

---

[1] Father did not contest the termination of his parental rights and has not appealed the Juvenile Court's judgment. We, therefore, restrict our review of this case to termination of Mother's parental rights.

[2] Trial initially began in May 2023, but the trial was discontinued after the guardian *ad litem* ("GAL") discovered that he had a conflict of interest. A new GAL was appointed for the Child, and a new trial was held in September 2023.

At trial, Mother testified that she was currently homeless, had been unemployed for two months, and did not have a driver's license. Prior to "camping", Mother was living at "the Y." Mother could not pin down exactly how many times she visited the Child in the decade after his removal from her custody. Mother first testified that she had visited the Child three times, but she ultimately settled on four or five times. Mother testified that she had not seen the Child since 2018. Mother was adamant that she did not believe she had any visitation rights.

Mother explained that she did not complete the required mental health assessment because she could not afford one, was never offered one, and was not in need of mental health treatment. Henson testified that DCS would have assisted Mother with her mental health assessment and anything else recommended in the permanency plans if she had stayed in contact with DCS. Hadley likewise testified that DCS would have paid for Mother's mental health assessment.

Mother's testimony often was unclear and disjointed. As the Juvenile Court found, Mother "interrupted others repeatedly and frequently failed to answer questions asked of her. When responding to questions, she would frequently give information unrelated to the question posed and would ramble through multiple topics and timeframes that had very little or nothing to do with the questions asked of her."

Henson testified that he was assigned to the case from December 2020 to March 2022. Henson stated that Mother had participated in the development of the first permanency plan in April 2020, but that DCS lost contact with Mother in May 2020. During Henson's time on the case, Mother never reached out to DCS "to work the steps on the parenting plan to be reunified with" the Child. The phone number Henson was given to contact Mother did not work, and he was never able to contact her. Mother, on the other hand, testified that she last visited the DCS office in 2021.

Hadley testified that she was the Child's current family service worker and had been assigned to the case since October 2022. Hadley explained that the Child has Down Syndrome, Autism, ADHD, and anxiety. According to Hadley, the Child receives 24/7 care and different types of therapies at Compassionate Care. When he first arrived at Compassionate Care, the Child exhibited aggressive behaviors, but his behavior has since improved. Hadley further testified that the Child is thriving and happy at Compassionate Care, is making friends, and improving his social skills.

When asked whether it would be difficult to adopt or have an adopted child like the Child, Henson responded, "Absolutely . . . it would take a specialty home to do so." Hadley likewise stated that the Child would be difficult to place in an adoptive home given his disabilities. Neither Henson nor Hadley knew of any prospective adoptive homes for the Child. Hadley, nevertheless, testified that the Child should stay in the group home, explaining:

I think that due to all of his needs, he is in an appropriate place right now, because they're able to assist him 24/7, especially with all the appointments that he has. They're able to assist him on all of those appointments and the transportation for him too. So I don't think it would be good for him to be moved right now.

Father likewise described Compassionate Care as the best place for the Child given the constant care he requires and receives there. Father further explained that it would be detrimental to the Child if he were to be moved from the facility and placed in Mother's custody, referencing the Child's tendency to "flip out" if he is removed from his "comfort zone."

On October 27, 2023, the Juvenile Court entered its final judgment terminating Father's and Mother's parental rights to the Child.[3] The Juvenile Court found that clear and convincing evidence supported every alleged ground with the exception of persistence of conditions, given that continuation of the parent-child relationship did not greatly dimmish the Child's chances of early integration into a safe, stable, and permanent home. The Juvenile Court further found that termination of Mother's parental rights was in the best interest of the Child. Mother timely appealed.

## Discussion

Although not stated exactly as such, Mother raises only one issue on appeal: whether the Juvenile Court erred in finding that termination of Mother's parental rights was in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[4] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley*

---

[3] The October 27, 2023 judgment was titled "Second Amended Order on Termination of Parental Rights." The Juvenile Court's three different iterations of the final judgment do not appear to differ in substance.

[4] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

*v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than

not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[5] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[6] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best

---

[5] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

[6] Tenn. Code Ann. § 36-1-113(i).

interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing

evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Although Mother does not challenge any of the grounds found against her, the Tennessee Supreme Court has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). Therefore, we must review the grounds found against Mother even though she does not dispute them.

On January 20, 2023, at the time the termination petition was filed, the relevant statutory grounds for termination read as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1)     Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

(2)     There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4;

* * *

(14)     A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g) (West July 1, 2022 to May 4, 2023).

Abandonment is defined in relevant part as follows:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

- 9 -

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

(ii)(a) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(b) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102 (West July 1, 2022 to May 4, 2023).

We first address whether the Juvenile Court erred by finding that clear and convincing evidence supports the ground of abandonment by failure to visit. The relevant timeframe for our analysis on this ground was September 20, 2022 through January 19, 2023. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) ("[T]he applicable four month window for determining whether child support has been paid in the context of . . . failure to support includes the four months preceding the day the petition to terminate parental rights is

- 10 -

filed but excludes the day the petition is filed."). In its final judgment, the Juvenile Court found that Mother did not visit the Child at all during the determinative period, that she was entitled to supervised visits with the Child during the determinative period, and that she did not raise the affirmative defense that her failure to visit was not willful. The evidence does not preponderate against these findings.

Tenn. Code Ann. § 36-1-102(1)(I) provides that a parent's lack of willfulness is an affirmative defense that must be established by a preponderance of the evidence. Although Mother did not raise the affirmative defense of lack of willfulness in a filing or at trial, Mother testified several times that she did not believe she had visitation rights. Even if Mother's testimony was sufficient for us to conclude that the affirmative defense had been tried by implied consent, Mother failed to prove that her failure to visit the Child was not willful.

The Juvenile Court did not suspend or prohibit Mother's visitation with the Child until May 2023, several months after the end of the four-month determinative period. Prior to its May 2023 order, the Juvenile Court had entered two orders providing for Mother's supervised visitation with the Child. In a November 2013 order, the Juvenile Court provided Mother with supervised visitation on the first, second, and fourth weekends of each month. Mother appealed that order to the Circuit Court, which affirmed and provided for expanded visitation in the event Mother obtained her own residence. In a July 2016 order, the Juvenile Court reiterated that Mother was allowed supervised visitation with the Child. Despite having visitation three weekends out of each month, Mother testified that she visited the Child at most five times since his removal from her custody in 2012. Mother testified that the last time she visited the Child was in 2018, several years before DCS filed the termination petition.

The permanency plans reference a "no contact" order, which may have been the basis for Mother's belief that she could not visit the Child. Nevertheless, Mother stopped visiting the Child in 2018, long before the development of the first permanency plan. Furthermore, the mistake in the permanency plans does not excuse Mother from seeking clarification of her visitation rights from the Juvenile Court or filing a petition for visitation. Our Supreme Court has previously found that an order suspending a parent's visitation rights will not necessarily preclude a finding that the parent willfully failed to visit the child. *See In re Adoption of Angela E.*, 402 S.W.3d 636, 642 (Tenn. 2013) ("Although Father filed a petition to reinstate his visitation rights, he took no action to advance the petition. Father had no reasonable excuse for failing to pursue the petition to reinstate visitation during those two years."). Based upon Mother's minimal visitation in the eight years prior to the first reference to a no contact order, her general failure to stay in contact with DCS, and her failure to seek the Juvenile Court's clarification of her visitation rights (although the Juvenile Court's previous orders quite clearly granted Mother supervised visitation with the Child), we are unable to say that Mother actively

tried to maintain visitation with the Child. Clear and convincing evidence demonstrated that Mother abandoned the Child by failing to visit during the determinative period.

The additional grounds found by the Juvenile Court were: (1) abandonment by failure to provide a suitable home; (2) substantial noncompliance with permanency plan; and, (3) failure to manifest an ability and willingness to assume custody. As instructed by *In re Carrington H.*, we have likewise reviewed the Juvenile Court's findings as to each of these additional grounds as found by the Juvenile Court. The evidence does not preponderate against any of the Juvenile Court's findings relevant to those grounds. Each of these additional grounds was proven by clear and convincing evidence, and we affirm the Juvenile Court's judgment as to these grounds.

We next address whether the Juvenile Court erred in finding that termination of Mother's parental rights was in the Child's best interest. When DCS filed its termination petition, the statutory best interest factors read as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:
(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;
(F) Whether the child is fearful of living in the parent's home;
(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;
(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;
(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

- 12 -

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

(5) As used in this subsection (i), "parent" includes guardian.

Tenn. Code Ann. § 36-1-113(i) (West July 1, 2022 to May 4, 2023).

With regard to making a determination concerning a child's best interest, the Tennessee Supreme Court has instructed:

> When conducting the best interests analysis, courts must consider nine statutory factors[7] listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d [507] at 523 [(Tenn. 2016)] (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d [533] at 555 [(Tenn. 2015)] (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).
>
> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the

---

[7] Although there are now twenty best interest factors instead of nine, our Supreme Court's instruction in *In re Gabriella D.*, 531 S.W.3d 662 (Tenn. 2017) still applies.

analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In considering the Child's best interest, the Juvenile Court made the following findings of fact:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority. This factor weighs in favor of termination. The child is in an appropriate placement where his extraordinary needs are met. Any change of placement would be very difficult for the child. The child had difficulty adjusting when moved to the current placement.

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition. This factor weighs in favor of termination. The child has down syndrome, very limited verbal skills, autism, ADHD, anxiety, can be aggressive, and is currently placed at Compassionate Care group house due to his need for 24/7 assistance. The child's current placement, Compassionate Care, is a Department of Intellectual and Developmental Disabilities (DIDD) home. Any change of placement would be very difficult for the child. The child was initially aggressive at Compassionate Care, but he is now doing well at the placement. The child receives multiple types of therapy and has an IEP for eighth grade education.

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs. This factor weighs in favor of termination of parental rights. The mother has not maintained stable housing or stable employment. She is currently homeless and living in a tent. Additionally, she does not have a driver's license. . . . Accordingly, both Respondents have been and continue to be unable to meet the child's basic needs, much less his extraordinary needs.

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment. This factor weighs in favor of termination. The mother has not seen or spoken to the child in many years. . . . Accordingly, there is no parental attachment or reasonable expectation that such an attachment can be created.

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child. This factor weighs in favor of termination. The mother has not seen or spoken to the child in many years. Mother admitted she knew of her visitation permitted by the November 6 2013, Order and only utilized one of those visits. (Visits were permitted on first, second, and fourth weekends). Mother last saw the child in 2018, and visited the child no more than 4-5 times since 2012. . . . Despite hav[ing] visitation privileges, neither parent capitalized on their opportunities for many years.

(F) Whether the child is fearful of living in the parent's home. No evidence was presented regarding this factor, so it is not applicable.

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms. No evidence was presented regarding this factor, so it is not applicable.

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent. No evidence was presented regarding this factor, so it is not applicable.

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage. The child has multiple siblings, however no evidence was presented regarding the existing relationships. Likewise, there was no proof presented regarding the child's relationship with other family members. Therefore, this factor is not applicable.

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner. This factor weighs in favor of termination of parental rights. Both parents are plagued by the same issues that prevented reunification for many years. The mother has not maintained stable housing or stable employment. She is currently

homeless and living in a tent. Additionally, she does not have a driver's license. Mother has been unemployed for at least the last two months. . . . .

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions. This factor weighs in favor of termination. . . . Mother refused to accept any assistance for a mental health assessment and treatment because she denies having mental health issues or needing treatment.

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department. This factor weighs in favor of termination. The Department developed permanency plans dated April 8, 2020, August 13, 2020, February 22, 2022, and February 9, 2023, and attempted to provide copies of the plans to the parents. DCS invited mother to participate in creating the first permanency plan, and she did attend the meeting. DCS found housing for the child to accommodate his significant disabilities and needs. DCS ensured the child received educational instruction consummate with his abilities and provided countless and continuing medical treatment and therapies for the child. DCS provided mother with information to assist her in obtaining the mental health treatment required by court orders and permanency plans. DCS tried to call the parents and mail case information to the parents at last known phone numbers and addresses. When the parents failed to update phone numbers and addresses with DCS, the case workers conducted various searches to discover contact information for the parents. DCS was prepared to pay for a mental health assessment for the mother. DCS assisted father in having an alcohol assessment.

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest. This factor weighs in favor of termination. Over the course of this decade long dependency and neglect saga[, n]either parent is in an improved situation at the time of trial. Again, mother is homeless, unemployed, and without a driver's license . . . . The child has down syndrome, very limited verbal skills, autism, ADHD, anxiety, can be aggressive.

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional,

or psychological abuse or neglect toward the child or any other child or adult. No evidence was presented regarding this factor, so it is not applicable.

(O) Whether the parent has ever provided safe and stable care for the child or any other child. No evidence was presented regarding this factor, so it is not applicable.

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive. This factor weighs in favor of termination. Although both parents were aware of the child's general diagnoses, neither parent has been involved with the child's medical care or therapies. So, neither parent has knowledge of the child's needs. Again, the child's needs are significant since the child has down syndrome, very limited verbal skills, autism, ADHD, anxiety, and can be aggressive. The child is in need of 24/7 assistance and care.

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive. This factor weighs in favor of termination of parental rights. The mother has not maintained stable housing. She is currently homeless and living in a tent. . . . The child's needs are significant since the child has down syndrome, very limited verbal skills, autism, ADHD, anxiety, and can be aggressive. The child is in need of 24/7 assistance and care. Neither parent's current home would even provide the child a bedroom, much less his medical needs.

(R) Whether the physical environment of the parent's home is healthy and safe for the child. This factor weighs in favor of termination of parental rights. The mother has not maintained stable housing. She is currently homeless and living in a tent. . . . The child's needs are significant since the child has down syndrome, very limited verbal skills, autism, ADHD, anxiety, and can be aggressive. The child is in need of 24/7 assistance and care. . . . Living in a tent is an inherently unsafe and insecure home for the child.

(S) Whether the parent has consistently provided more than token financial support for the child. This factor weighs in favor of termination regarding the mother. Exhibit 28 is an income withholding order garnishing the mother's wages at Skip's Grill. But, it appears to be for

support owed one of her other children, not the child at issue in this case. . . . .

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child. This factor is inapplicable. No proof was presented in this regard. It is noted that the absence of proof was due, in part, to the mother's refusal to participate in a mental health assessment and any recommended treatment.

Mother does not specifically identify which factors the Juvenile Court purportedly weighed incorrectly but rather argues that "termination would be a punishment" for her "alleged imperfections" and "provide no benefit or improvement in this child's life." She further contends that the Child likely will not be adopted by a family, the Child likely will remain in the State's care for the rest of his life, and his relationships with his siblings will be severed. Mother further argues that she will be prevented from seeing the Child.

Mother's argument would be more compelling if she had visited the Child more than five times over the course of a decade or if there had been any indication that Mother and the Child have a meaningful relationship, or any relationship at all. Mother has not visited the Child since 2018 and has no relationship with him, regardless of the likelihood of adoption. Although the Child lived with one sister while in Father's and then Paternal Grandparents' custody, there was no evidence to indicate what kind of relationship the Child has with his sister or if he has any relationship with his other two siblings.

The fact that the Child is not in a pre-adoptive home and very well may not be adopted does not alter the fact that Mother is a stranger to him and incapable of parenting and caring for him. As this Court has previously stated, "adoption and termination of parental rights are separate inquiries." *In re Seth B.*, No. E2017-00173-COA-R3-PT, 2017 WL 4082484, at *15 (Tenn. Ct. App. Sept. 14, 2017). The father in *In re Seth B.* argued that termination of his parental rights to his children was not in their best interest given that their foster parents had not indicated a desire to adopt them. *Id.* This Court rejected the father's argument because he was incapable of providing the children a stable, drug-free home; the children's behaviors were improving under the foster parents' care; and "a safe and stable foster home" was in their best interest. *Id.* Likewise, in this case, Mother cannot provide the Child with a stable home or adequate parenting and care, the Child's behavioral issues have improved since being at Compassionate Care, Father agreed that Compassionate Care was the best place for him, and Mother acknowledged that she could not take care of him at that point in time.

- 19 -

Mother testified that she was homeless, unemployed, and without a driver's license. Based upon the evidence at trial, Mother cannot take care of herself, much less a child requiring therapy, transportation to appointments, and 24/7 care. The Child also does not adapt well to changes in his environment. Mother does not have a stable home environment to provide the Child. After more than a decade since she lost custody of the Child, Mother has not demonstrated much interest in the case or the Child. Mother had more than a decade to secure stable employment and a stable home for the Child, yet she has been unable to do so, even failing to muster enough interest to visit the Child more than five times over the course of a decade. Clear and convincing evidence supported the Juvenile Court's conclusion that termination of Mother's parental rights was in the Child's best interest.

## Conclusion

For the foregoing reasons, we affirm the Juvenile Court's judgment terminating Mother's parental rights to the Child. This cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Chasity R., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE